UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

THERESA M. OWENS,

        Plaintiff,

v.

ELI LILLY AND COMPANY,

        Defendant.

CIVIL ACTION No. 04-11562 (JLT)

**DEFENDANT ELI LILLY AND COMPANY'S
MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Plaintiff Theresa Owens ("Plaintiff") alleges she was exposed to a drug, DES, while *in utero* and said exposure caused her harm. All of Plaintiffs' claims fail as a matter of law, because Plaintiff was on notice of her claims more than three years before filing suit.

WHEREFORE, Lilly respectfully requests that judgment be granted in its favor on all counts.

**STATEMENT OF UNDISPUTED FACTS**

1.    Plaintiff has asserted claims sounding in negligence, strict liability, breach of warranty, and misrepresentation. *See* Complaint (a true copy of which is attached hereto as Exhibit 1 to the Affidavit of Ashley A. Weaver ("Weaver Aff.")). She commenced this suit on August 7, 2003. Complaint (Weaver Aff., Exhibit 1).

2.    Plaintiff alleges that her mother took diethylstilbestrol ("DES") during her pregnancy with Plaintiff.[1] Complaint at ¶ 3 (Weaver Aff., Exhibit 1).

---

[1] Lilly disputes that Plaintiff was exposed to diethylstilbestrol. For the purposes of this motion only, Lilly assumes that plaintiff was exposed to diethylstilbestrol without waiving its rights to challenge this fact at trial.

3.      Plaintiff has known of her alleged DES exposure since approximately 1981. Plaintiff Theresa M. Owens' Answers to Defendant Eli Lilly and Company's First Set of Interrogatories ("Interrog.") No. 10 (Weaver Aff., Exhibit 2).

4.      Plaintiff alleges that, as a result of said exposure, she was diagnosed in 1993 with a T-shaped hypoplastic uterus and primary infertility. Interrog. No. 13 (Weaver Aff., Exhibit 2).

5.      On June 21, 1993, Plaintiff was notified by her fertility specialist and testifying expert, Dr. Merle J. Berger, that she had "a tiny uterus." June 21, 1993 Letter from Dr. Berger to Mr. and Mrs. Owens ("Berger Letter to Plaintiff") (Weaver Aff., Exhibit 3). Dr. Berger identified this uterine abnormality as the sole identifiable cause for Plaintiff's infertility. Berger Letter to Plaintiff (Weaver Aff., Exhibit 3).

6.      In 1993, Dr. Berger believed that Plaintiff's "tiny" uterus was caused by exposure to DES. Deposition of Dr. Merle J. Berger ("Berger Tr.") at 34 (Weaver Aff., Exhibit 4); *see also* February 8, 1993 Letter from Dr. Berger to Plaintiff's gynecologist, Dr. Goulart ("Berger Letter to Goulart") (writing that Plaintiff "has a small T-shaped uterus … which is a text book example of a hypoplastic DES exposed uterus. … I strongly suspect that this infertility is DES related.") (Weaver Aff., Exhibit 5).

7.      Had Plaintiff asked Dr. Berger in 1993 what caused her uterine abnormality, he would have told her that he believed DES was the cause. Berger Tr. at 35, 46 (Weaver Aff., Exhibit 4).

8.      Plaintiff maintains that at no time has she performed any research on DES. Deposition of Theresa M. Owens ("Pl. Tr.") at 38-39, 97 (Weaver Aff., Exhibit 6).

9.      At the time of her deposition in March, 2004, she had had access to the Internet for approximately five years, and she knows how to perform Internet searches. Pl. Tr. at 97-98

(Weaver Aff., Exhibit 6).  Plaintiff has also worked at The Boston Globe newspaper for over 17 years and has access to the newspaper at work.  Pl. Tr. at 18-21, 98 (Weaver Aff., Exhibit 6).

10. Plaintiff is generally aware of products liability lawsuits, including those against automobile manufacturers, the manufacturers of breast implants, and McDonald's.  Pl. Tr. at 92-95 (Weaver Aff., Exhibit 6).

11. Information about the injuries allegedly caused by *in utero* exposure to DES and DES litigation is widely available on the Internet through common search engines such as Yahoo! and Google.  *See* Excerpts of Search Results concerning DES and infertility (Weaver Aff., Exhibit 7).

12. Information from DES Action, a support group for women exposed to DES, also had information regarding causation available on the Internet as early as 1996.  *See* list of archived Internet pages (Weaver Aff., Exhibit 8).  This site asserted, at least as early as April, 1999 that infertility was more frequent in "DES daughters" than in the population at large.  *See* search results from archived pages of www.desaction.org (Weaver Aff., Exhibit 8).  At least as early as April, 1999, this website also reported on DES litigation and provided attorney referrals for DES-exposed women.  *See* search results from archived pages of www.desaction.org (Weaver Aff., Exhibit 8).

13. In 1991, the Time Magazine cover story discussed DES exposure in the context of the possible causes of infertility.  "Making Babies:  More than a million couples seek treatment for infertility each year," September 30, 1991 at page 1-2 (Weaver Aff., Exhibit 9).  A 1991 USA Today article also mentioned DES exposure in connection with miscarriages and other reproductive difficulties.  "Women, DES and Decades of Desolation," November 25, 1991 at page 1 (Weaver Aff., Exhibit 10).

14. The Boston Globe published at least several articles and editorials in the 1990's discussing the impact of diethylstilbestrol exposure on fertility. *E.g.,* Julie Kimball, *Quilt, Dreams Weave A New Story*, BOSTON GLOBE, February 8, 1999 (Weaver Aff., Exhibit 11); Nathan Cobb, *A Net Gain For Motherhood - Hopeful Parents Using Web To Locate A Surrogate Mom*, BOSTON GLOBE, June 1, 1998 (Weaver Aff., Exhibit 12); *Ask Your Mother*, BOSTON GLOBE, June 11, 1995 (Weaver Aff., Exhibit 13); *see also* Beverly Beckham, *Op-Ed, Still Learning From DES Flaws*, BOSTON HERALD, Jan. 17, 1996 (Weaver Aff., Exhibit 14).

15. By 1977, and thereafter, medical literature had noted associations between DES exposure and infertility. *See* Kaufman, *et al.*, "Upper Genital Tract Changes Associated with Exposure In Utero to Diethylstilbestrol," 128 *Am. J. Obstet. Gynecol.* 51 (May 1, 1977); *see also*, Excerpts of Search Results from www.pubmed.com (Weaver Aff., Exhibit 15).

16. Information on legal claims alleging negligence by makers of DES is also widely available on the Internet and in popular news sources. Numerous lawsuits against DES manufacturers were filed in the 1970s, 1980s, 1990s, and 2000s concerning injuries allegedly caused by *in utero* exposure to DES, and the results of these lawsuits were reported in the popular press. *See, e.g.*, Indices of Popular Literature (Weaver Aff., Exhibit 16); Westlaw search of Massachusetts media sources concerning diethylstilbestrol (Weaver Aff., Exhibit 17). In Massachusetts, where Plaintiff has lived her entire life, a putative class action was filed in 1976. *Payton v. Abbott Labs.*, 437 N.E.2d 171, 173 (Mass. 1982).

17. As example only, the Boston Globe published a story in 1994 about a group of women that were awarded $42.3 million due to cancer and reproductive problems allegedly related to DES. 11 Get $42.3M In DES Lawsuit, BOSTON GLOBE, January 9, 1994 (Weaver Aff.,

Exhibit 18). The Boston Herald newspaper reported the same information. News In Brief, *DES Women Awarded $42.3M*, BOSTON HERALD, Jan. 9, 1994 (Weaver Aff., Exhibit 19).

**ARGUMENT**

**I.    SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Carroll v. Xerox Corp.*, 294 F.3d 231, 236-37 (1st Cir. 2002). Once the moving party has made a showing that no genuine issue of material fact exists, the burden shifts to the non-moving party to come forward with "specific evidence that sufficiently contradicts or undermines the movant's case to demonstrate a material factual dispute." *United Mine Workers of Am. v. Pittston Co.*, 984 F.2d 469, 473, 299 U.S. App. D.C. 339 (D.C. Cir. 1993); *see also Carroll*, 294 F.3d at 236. In meeting its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Bias v. Advantage Int'l, Inc.*, 905 F.2d 1558, 1561, 284 U.S. App. D.C. 391 (D.C. Cir. 1990) (quoting *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, the evidence submitted must be such that a reasonable jury could find for the non-moving party. *Heller v. Fortis Benefits Ins. Co.*, 142 F.3d 487, 492, 330 U.S. App. D.C. 39 (D.C. Cir. 1998). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial" and the court must grant summary judgment for the moving party. *Brees v. Hampton*, 877 F.2d 111, 117, 278 U.S. App. D.C. 176 (D.C. Cir. 1989) (quoting *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## II. PLAINTIFFS CLAIMS ARE BARRED BY THE DISTRICT OF COLUMBIA STATUTE OF LIMITATIONS

Lilly is entitled to summary judgment, because Plaintiff's claims are time barred. Plaintiff commenced this suit in the District of Columbia, thus, the District of Columbia's procedural law applies. In the District of Columbia, product liability claims are governed by a three-year statute of limitations. D.C. Code § 12-301(8) (2001); *Smith v. Brown & Williamson Tobacco Corp.*, 3 F. Supp. 2d 1473, 1475 (D.D.C. 1998). Plaintiff filed this lawsuit on August 7, 2003. Complaint (Weaver Aff., Exhibit 1). Accordingly, if Plaintiff's cause of action arose any time prior to August 7, 2000, her claims are time-barred under the District's statute. In products liability cases, the District of Columbia applies a three pronged "discovery rule." Under this rule, a plaintiff's claims accrue when the plaintiff "know[s], *or by the exercise of reasonable diligence should know* (1) of the injury, (2) its cause in fact, and (3) of some evidence of wrongdoing." *Bussineau v. President & Dir. of Georgetown Coll.*, 518 A. 2d 423, 435 (D.C. 1986) (emphasis added).

The evidence establishes that Plaintiff's cause of action accrued well before August, 2000. There is no question that Plaintiff was aware of all of her claimed injuries by 1993. Interrog. No. 13 (Weaver Aff., Exhibit 2). There is also no question that had Plaintiff *merely asked* her infertility specialist in 1993 what caused her injuries, he would have told her that he believed DES was the cause. Berger Tr. at 35, 46 (Weaver Aff., Exhibit 6). Finally, had Plaintiff engaged in *any bit* of research about DES, she would have learned of allegations of wrongdoing against the manufacturers of DES sufficient to put her on notice of her claims and to start the statute of limitations clock running. *See generally* Statement of Undisputed Facts, ¶¶ 9-13.

### A.     Prong 1:  Plaintiff Knew Of Her Injuries More Than Three Years Before Filing Suit

Plaintiff claims that DES caused her T-shaped uterus and infertility.  Interrog. No. 13 (Weaver Aff., Exhibit 2).  Both of these injuries were diagnosed in 1993.  Interrog. No. 13 (Weaver Aff., Exhibit 2).  Because Plaintiff knew of all her claimed injuries prior to August, 2000, the first prong of the District of Columbia discovery rule is satisfied.  *Bussineau*, 518 A. 2d at 435 (D.C. 1986).

### B.     Prong 2:  Plaintiff Had A Duty To Investigate The Cause Of Her Injuries

Under District of Columbia law, plaintiffs have an affirmative duty to act reasonably and diligently in determining whether or not they have a cause of action.  *Diamond v. Davis*, 680 A. 2d 364, 372, 381 (D.C. 1996).  If a reasonable investigation would have led to actual notice, a plaintiff is deemed to be on inquiry notice of her claim.  *Id.* at 372.  This duty applies to all three prongs of the discovery rule.  *Bussineau*, 518 A. 2d at 435.  "The discovery rule does not . . . give the plaintiff *carte blanche* to defer legal action indefinitely if she knows or should know that she may have suffered injury and that the defendant may have caused her harm."  *Hendel v. World Plan Exec. Council*, 705 A. 2d 656, 661 (D.C. 1997).  Plaintiff Theresa Owens has failed to meet her duty to investigate as a matter of law.  Because a reasonable investigation would have led to actual notice, Plaintiff should be charged with inquiry notice of her claims.

Plaintiff has known since 1981 that she had been exposed *in utero* to DES.  Interrog. No. 10 (Weaver Aff., Exhibit 2).  She has also known since 1993 that she is infertile and suffers from a uterine abnormality.  Interrog. No. 13 (Weaver Aff., Exhibit 2).  Despite this knowledge, Plaintiff maintains that she has never performed any research into what effect her exposure to DES might have had.  Pl. Tr. at 97 (Weaver Aff., Exhibit 6).  Had Plaintiff performed the most *minimal* investigation, she would have learned of a possible causal link between her DES

exposure and her claimed injuries. Thus, she should be charged with inquiry notice of her claims. *Diamond*, 680 A. 2d at 372.

### 1. Dr. Berger Would Have Told Plaintiff That He Believed Her Injuries Were Caused By DES Exposure

Dr. Berger, Plaintiff's fertility specialist from 1991 to 1993 and a long-time plaintiffs expert in DES cases, unequivocally testified that he would have told Plaintiff that he believed her injuries were caused by DES had she only asked him. Berger Tr. at 35, 46 (Weaver Aff., Exhibit 4); *see also* Berger Letter to Goulart (Weaver Aff., Exhibit 5). But, Plaintiff never asked this very simple question, despite protestations that she did and still does want to conceive a biological child. A "tiny" uterus and inability to become pregnant are not routine injuries. A reasonable person who was trying to become pregnant would have made this inquiry of her doctors. Had Plaintiff merely asked Dr. Berger what he believed the cause of her injuries to be, she would have learned that his answer was, "DES."

### 2. The Internet And Other Information Sources Would Have Revealed To Plaintiff That DES Could Have Caused Her Injuries

Plaintiff also had numerous other resources available to her, had she made any effort to inquire into the possible cause of her injuries. Plaintiff has worked at The Boston Globe newspaper for over 17 years and has access to the newspaper at work. Pl. Tr. at 20, 98 (Weaver Aff., Exhibit 6). Numerous articles on the alleged connection between DES and infertility have appeared in The Boston Globe and other Massachusetts news sources over the years. As example only, The Boston Globe published at least several articles and editorials in the 1990's discussing the impact of diethylstilbestrol exposure on fertility. *E.g.,* Julie Kimball, Quilt, Dreams Weave A New Story, BOSTON GLOBE, February 8, 1999 (Weaver Aff., Exhibit 11); Nathan Cobb, A Net Gain For Motherhood - Hopeful Parents Using Web To Locate A Surrogate Mom, BOSTON GLOBE, June 1, 1998 (Weaver Aff., Exhibit 12); *Ask Your Mother*, BOSTON

GLOBE, June 11, 1995 (Weaver Aff., Exhibit 13); s*ee also* Beverly Beckham, *Op-Ed, Still Learning From DES Flaws*, BOSTON HERALD, Jan. 17, 1996 (Weaver Aff., Exhibit 14).

      Moreover, information about the alleged injuries caused by *in utero* exposure to DES is widely available on the Internet through common search engines such as Yahoo! and Google. *See* Excerpts of Search Results concerning DES and infertility (Weaver Aff., Exhibit 7). Information from DES Action, a support group for women exposed to DES, had information regarding causation available on the Internet as early as 1996. *See* list of archived Internet pages and search results from archived pages (Weaver Aff., Exhibit 8). This site asserted, at least as early as April, 1999 that infertility was more frequent in "DES daughters" than in the population at large. *See* search results from archived pages of www.desaction.org (Weaver Aff., Exhibit 8). By 1977, and thereafter, medical literature had also noted associations between DES exposure and infertility. *See* Kaufman, *et al.*, "Upper Genital Tract Changes Associated with Exposure In Utero to Diethylstilbestrol," 128 *Am. J. Obstet. Gynecol.* 51 (May 1, 1977); *see also*, Search Results from www.pubmed.com (Weaver Aff., Exhibit 15).

      In 1991, the Time Magazine cover story discussed DES exposure in the context of the possible causes of infertility. "Making Babies: More than a million couples seek treatment for infertility each year," September 30, 1991 at page 1-2 (Weaver Aff., Exhibit 9). A 1991 USA Today article also mentioned DES exposure in connection with miscarriages and other reproductive difficulties. "Women, DES and Decades of Desolation," November 25, 1991 at page 1 (Weaver Aff., Exhibit 10).

      In short, Plaintiff had a wealth of information available to her. Had she made any investigation, much less the reasonable and diligent investigation she was tasked with making

under the District's discovery rule, she would have gained actual knowledge of a causal connection between her DES exposure and infertility.

### C. Prong 3: Plaintiff Had A Duty To Investigate Whether Her Injuries Were The Result of Some Wrongdoing

As stated above, Plaintiff's duty to investigate extends to all three prongs of the District's discovery rule. *See Bussineau*, 518 A. 2d at 435. Thus, Plaintiff also had a duty to investigate whether her injuries might have been the result of some wrongdoing. However, Plaintiff maintains she failed to take advantage of a multitude of resources including the Internet, national news media, and previous lawsuits against DES manufacturers. These resources would have provided Plaintiff with actual notice of potential wrongdoing. Consequently, she should be charged with inquiry notice of the information a reasonable investigation would have revealed. *Diamond*, 680 A. 2d at 372.

#### 1. The District of Columbia Courts Hold Plaintiffs Accountable for Their Lack of Due Diligence.

It is well-established that the District of Columbia statute of limitations bars actions where the plaintiff did not act diligently after discovering at least some evidence of wrongdoing. *See Nelson v. American Nat'l Red Cross*, 815 F. Supp. 501, 503 (D.D.C. 1993), *aff'd in part, rev'd in part*, 26 F.3d 193 (D.C. Cir. 1994) (granting summary judgment against victim of HIV-tainted transfusion on statute of limitations grounds, despite the fact that plaintiff was never expressly told of wrongdoing); *Mattola v. Georgetown University Hospital*, 1992 WL 13198, *4-5 (D. D.C. 1992) (granting summary judgment on statute of limitations grounds because plaintiff was charged as a matter of law with knowledge of the wrongdoing evident in her medical records, even if she had not read them). Notice of wrongdoing and failure to act with due diligence has led a wide array of tort claims to be barred under the D.C. statute of limitations. *See, e.g., Stewart v. O'Malley*, No. Civ. A. 97-CV-184 (RM), 1998 WL 29499 (D.D.C. Jan. 21,

1998) (legal malpractice); *Reese v. Geneva Enters., Inc.*, No. Civ. A. 96-1575 (LFO), 1997 WL 214864 (D.D.C. Apr. 18, 1997) (emotional distress and fraudulent misrepresentation); *Burda v. National Ass'n of Postal Supervisors*, 592 F. Supp. 273 (D.D.C. 1984); *Cevenini v. Archbishop of Washington*, 707 A.2d 768 (D.C. 1998) (negligent hiring, fraud, emotional distress); *Allen v. Hill*, 626 A.2d 875 (D.C. 1993) (medical malpractice).

In the DES context, courts applying District of Columbia law have not shied away from barring claims brought by plaintiffs who fail to conduct a reasonably diligent investigation. In *Albers v. Eli Lilly and Company*, the Seventh Circuit held under the District of Columbia discovery rule that the absence of actual knowledge of tortious conduct by Lilly did not prolong the accrual period, because the plaintiff, *by objective standards*, was on notice to investigate her claim. 354 F.3d 644, 645 (7th Cir. 2004) (per curium). The court stated that "a reasonable person would have commenced an inquiry [after learning of her injury and its cause] and swiftly would have found some evidence of wrongdoing." *Id.* A reasonable inquiry would have disclosed the existence of literally thousands of DES claims and other facts that gave indications of tortious conduct. *See Albers v. Eli Lilly and Company*, 257 F.Supp. 2d 1147, 1151 (N.D. Ill. 2003). Knowledge of those facts, available on even modest inquiry, is attributable to plaintiff and, in *Albers*, required entry of judgment for defendant.

*Albers* was recently adopted by the District Court for the District of Columbia as an accurate application of the District's discovery rule. *Roberge v. Eli Lilly and Co.*, 03-CV-01008 (RCL) (D.D.C. Mar. 11, 2005) (Weaver Aff., Exhibit 20). In *Roberge*, as here, plaintiff did not have actual knowledge of alleged wrongdoing, but rather had *access* to resources that would have provided such notice. *See Roberge*, 03-CV-01008, at 16 (barring plaintiff's DES claims because though she was stressed and upset over her inability to conceive, she failed to take

advantage of the physicians at her disposal to investigate potential claims). Plaintiff's claims were barred in *Roberge*, because plaintiff "did nothing to find out more about DES." *Id.*

      2.    <u>Had Plaintiff Made a Reasonable and Diligent Investigation, She Would Have Known of Her Ability to Sue Prior to August, 2000.</u>

In spite of her duty to conduct a reasonable investigation, Plaintiff waited 10 years to investigate a possible claim, despite ample opportunity to do so and a vast array of resources at her disposal. If Plaintiff had pursued reasonable avenues of investigation that were open to her prior to August, 2000, there is no question that she could have, and would have, learned about DES lawsuits alleging infertility and related physical injuries; *i.e.*, she could easily have learned about alleged wrongdoing by DES manufacturers. *See Albers*, 257 F. Supp. 2d at 1151.

      a.    DES Litigation History.

Since the 1970's, individuals have filed suits against DES manufacturers alleging injuries similar to Plaintiff's. The first DES lawsuit, a multiple plaintiff case, was filed on September 17, 1974. *See Abel v. Eli Lilly & Co.*, 289 N.W.2d 20, 22 (Mich. Ct. App. 1979). In Massachusetts, where Plaintiff has lived her entire life, a putative class action was filed in 1976. *Payton v. Abbott Labs.*, 437 N.E.2d 171, 173 (Mass. 1982). Through the years, scores of DES cases have been filed throughout the country.[2]

---

[2] The following is a partial listing of reported decisions – many of them involving claims for infertility or reproductive anomalies – issued in DES litigation. See, e.g.: Kurczi v. Eli Lilly & Co., 113 F.3d 1426 (6th Cir. 1997) (Ohio); Wood v. Eli Lilly & Co., 38 F.3d 510 (10th Cir. 1994) (Okla.); Castrignano v. E.R. Squibb & Sons, Inc., 900 F.2d 455 (1st Cir. 1990) (R.I.); Krist v. Eli Lilly & Co., 897 F.2d 293 (7th Cir. 1990) (Wis.); Hoferr v. Dart Indus., Inc., 853 F.2d 259 (4th Cir. 1988) (Md.); Glater v. Eli Lilly & Co., 744 F.2d 213 (1st Cir. 1984) (N.H.); McElhaney v. Eli Lilly & Co., 739 F.2d 340 (8th Cir. 1984) (S.D.); Mathis v. Eli Lilly & Co., 719 F.2d 134 (6th Cir. 1983) (Tenn.); Renfroe v. Eli Lilly & Co., 686 F.2d 642 (8th Cir. 1982) (Mo.); O'Brien v. Eli Lilly & Co., 668 F.2d 704 (3d Cir. 1981) (Pa.); Narum v. Eli Lilly & Co., 914 F. Supp. 317 (D. Minn. 1996); Holder v. Eli Lilly & Co., 708 F. Supp. 672 (E.D. Pa. 1989); Lester v. Eli Lilly & Co., 698 F. Supp. 843 (D. Kan. 1988); Brown v. Eli Lilly & Co., 690 F. Supp. 857 (D. Neb. 1988); Webber v. Eli Lilly & Co., 117 F.R.D. 490 (D. Me. 1987); Burel v. Berlex Labs., Inc., No. C84-1624A, 1986 WL 30018 (N.D. Ga. Oct. 8, 1986); Schneider v. Eli Lilly & Co., 556 F. Supp. 809 (E.D. La. 1983); Tidler v. Eli Lilly & Co., 95 F.R.D. 332 (D.D.C. 1982); Gray v. United States, 445 F. Supp. 337 (S.D. Tex. 1978); Sutowski v. Eli Lilly & Co., 696 N.E.2d 187 (Ohio 1998); Conley v. Boyle Drug Co., 570 So. 2d 275 (Fla. 1990); Smith v. Eli Lilly & Co., 560 N.E.2d 324 (Ill. 1990); Loerch v. Eli Lilly & Co., 445 N.W.2d 560 (Minn. 1989); Mulcahy v. Eli Lilly & Co., 386 N.W.2d 67 (Iowa 1986); Cavanaugh v. Abbott Labs., 496 A. 2d 154

     b.  DES News in the Popular Press and on the Internet.

Once the first DES lawsuit was filed in 1974, there was widespread publicity in the popular press about DES and the lawsuits against DES manufacturers. *See, e.g.*, Indices of Popular Literature (Weaver Aff., Exhibit 12); Westlaw search of Massachusetts media sources concerning diethylstilbestrol (Weaver Aff., Exhibit 13). As example only, the Boston Globe published a story in 1994 about a group of women that were awarded $42.3 million due to cancer and reproductive problems allegedly related to DES. 11 Get $42.3M In DES Lawsuit, BOSTON GLOBE, January 9, 1994 (Weaver Aff., Exhibit 18). The Boston Herald newspaper reported the same information. News In Brief, *DES Women Awarded $42.3M*, BOSTON HERALD, Jan. 9, 1994 (Weaver Aff., Exhibit 19). At least as early as April, 1999, DES Action, a support group for women exposed to DES, reported on DES litigation and provided attorney referrals for DES-exposed women. *See* search results from archived pages of www.desaction.org (Weaver Aff., Exhibit 8).

## CONCLUSION

In sum, the crucial knowledge of 1) the alleged causal connection between DES exposure and infertility, and 2) wrongdoing on the part of DES manufacturers was knowable to Plaintiff well before August, 2000 and could easily have been obtained through the simplest effort, much less by reasonable diligence. Where a reasonable investigation would have led to actual knowledge, Plaintiff must be charged with inquiry notice. *Diamond*, 680 A. 2d at 372. Her unreasonable failure to investigate the possibility of causation and wrongdoing in a timely manner should bar her claims now.

---

(Vt. 1985); Collins v. Eli Lilly & Co., 342 N.W.2d 37 (Wisc. 1984); Martin v. Abbott Labs., 689 P.2d 368 (Wash. 1984); Zafft v. Eli Lilly & Co., 676 S.W.2d 241 (Mo. 1984); Sindell v. Abbott Labs., 607 P.2d 924 (Cal. 1980).

- 14 -

                                      Respectfully submitted,

                                      ELI LILLY AND COMPANY
                                      by its attorneys

                                      /s/ James J. Dillon_____
                                      James J. Dillon, BBO # 124660
                                      Foley Hoag LLP
                                      155 Seaport Boulevard
                                      Boston, MA 02210-2600
                                      (617) 832-1000

Dated: February 2, 2006